STATE OF IOWA, Appellant, v. NORMAN G. BAKER et al., Appellees.

No. 40732.

FEBRUARY 17, 1931.

REHEARING DENIED MAY 6, 1931.

John Fletcher, Attorney-general, Gerald O. Blake, Assistant

Attorney-general, Harold E. Wilson, County Attorney, and C. R. Stafford, for appellant.

Hanley & Hanley, Thompson & Thompson, and J. F. Devitt, for appellees.

STEVENS, J.—The appellee Baker is the owner and proprietor of the Baker Institute located at Muscatine, Iowa. The Baker Institute was established and is maintained for the purpose of treating certain diseases, particularly cancer, tumors, goiter, prostate gland troubles, stomach ulcers, rheumatism, gall stones and diabetes. None of the parties named as defendants in this action are, or have ever been, licensed to practice medicine in this state. As none of the defendants who were enjoined have appealed, we have only to consider the case against the appellee Baker. A brief recital of some of the more prominent facts in the case will help to more clearly understand the scope of the issue involved.

It is conceded that appellee is the owner of a secret formula, liquid in form, for the treatment of cancer and other diseases which was administered to patients in the Institute hypodermically. It is also conceded that the defendant Hoxsey was the owner and proprietor of a secret formula in the form of a powder which was also used in the Institute for the treatment of patients afflicted with cancer and other diseases. Some of the defendants and others employed at the Institute were known, and are designated in the record, as "treaters." It was the duty of the treaters to administer all treatments to the various patients in the Institute or housed in other buildings. Each prospective patient seeking entrance to the Institute underwent a medical examination by a licensed physician who entered his findings upon a blank diagnosis chart printed on yellow paper supplied for that purpose, which included the name of the patient, the history and previous treatment of the disease, so far as possible, and a statement of the nature, character and specific location of the disease from which the patient was suffering. The chart contained no blank space to be filled in showing the medicine or treatment to be administered. A number of the original charts duly filled out were introduced in evidence, to each of which there is attached a white card containing the signature of a

licensed physician, which is designated as a treatment card. This blank card has a column headed "ailment," and one headed "treatment." Each of the treatment cards is signed by the physician in dark ink and the designation of the medicine to be used is written in the proper column in red ink or pencil. All of the treatment cards before us bear the signature of Dr. Bair, except one, which is signed "J. L. Statler, M.D." Statler was a licensed physician employed at the Institute. The diagnosis chart shows that patients were examined by Statler, some by Bair and some by Leffler. The secret formula of appellee is a liquid and designated on the treatment cards as "intra & Int." No. 1 or No. 2. The Hoxsey formula is designated on the treatment cards as "powder No. 1."

So far as the record shows, the liquid and powder referred to were the only medicines used in the treatment of cancer, goiter and other diseases. No physician employed at the hospital knew the formula for compounding either the liquid or the powder. These compounds were strictly secret and, so far as shown, known only to Baker and Hoxsey respectively.

Drs. Arey, Bair, Barewald and Norton employed at the Institute at different times for brief periods all testified that they did not prescribe the treatment administered to the patients. Dr. Barewald testified that he visited some of the patients and to some extent observed the treatments given. The treaters did not administer the treatments under the direction or supervision of a physician. The quantity of the liquid to be administered and the place where the hypodermic needle was to be inserted were determined by them. The only aid they had was the general instructions. Perhaps this statement should be modified to the extent of saying that, generally, the treatments were administered without the aid or direction of a licensed physician.

A very large percentage of the patients treated were afflicted with cancer. The head nurse employed at the instutition and other practical and trained nurses and some of the treaters testified that they had been given general instructions and understood from the location of the cancer or other disease as indicated on the chart where the treatment should be administered hypodermically without the specific aid or direction of a physician. It should perhaps be stated that the treaters and nurses understood that the secret compounds were always to be used in

the treatments administered. The patients were, so far as possible, housed and treated in the Institute.

As stated, the sole question of fact to be determined by this court is: Has the appellee engaged in the practice of medicine without a license from the health department of the state of Iowa? It being admitted that appellee is not a licensed physician, the question of fact further reduces itself to the one inquiry: Does the record show that appellee was, or has been, engaged in the practice of medicine in the state of Iowa? Before proceeding further with the statement of the remaining facts, we desire to consider briefly what constitutes the practice of medicine in this state and what it is that is prohibited by the statute. The statutes of this state, so far as material, are as follows (Code, 1927):

"Sec. 2439. No person shall engage in the practice of medicine and surgery, podiatry, 'osteopathy,' 'osteopathy and surgery,' chiropractic, nursing, dentistry, dental hygiene, optometry, pharmacy, cosmetology, barbering, or embalming as defined in the following chapters of this title, unless he shall have obtained from the state department of health a license for that purpose.

"Sec. 2528. The opening of an office or place of business for the practice of any profession for which a license is required by this title, the announcing to the public in any way the intention to practice any such profession, the use of any professional degree or designation, or of any sign, card, circular, device, or advertisement, as a practitioner of any such profession, or as a person skilled in the same, shall be prima facie evidence of engaging in the practice of such profession.

"Sec. 2538. For the purpose of this title the following classes of persons shall be deemed to be engaged in the practice of medicine and surgery:

"1. Persons who publicly profess to be physicians or surgeons or who publicly profess to assume the duties incident to the practice of medicine or surgery.

"2. Persons who prescribe and furnish medicine for human ailments or treat the same by surgery."

The foregoing statutes have been repeatedly interpreted and construed by this court. State v. Bresee, 137 Iowa 673; State v. Edmunds, 127 Iowa 333; State v. Kendig, 133 Iowa 164;

State v. Adkins, 145 Iowa 671; State v. Frutiger, 167 Iowa 550; State v. Zechman, 157 Iowa 158; State v. Corwin, 151 Iowa 420; State v. Hueser, 205 Iowa 132; State v. Hughey, 208 Iowa 842.

Interpreting and construing the statutes just quoted, we said in State v. Bresee, supra:

"The statute, as we have seen, specifically and separately enumerates each of these acts: (a) Publicly professing to be a physician and assuming the duties of the profession; (b) prescribing medicines for the sick; (c) prescribing and furnishing medicine for the sick, and provides that any person making a practice of either shall be held to be practicing medicine within the meaning of the law. It is quite clear from the statute that the Legislature did not understand that these phrases are merely different expressions of the same idea. Both expressions appear to have been used in order to bring within the scope of the act both the person who professes to be a physician and assumes the duties of that profession and the person who, while not claiming to be a physician, and not assuming the duties of the profession generally, yet undertakes to prescribe and furnish remedies for the sick and afflicted."

Similar statutes and definitions exist in most jurisdictions and are contained in the following cases: Fason v. State, 98 So. (Ala.) 702; Gobin v. State, 44 L. R. A. (N. S.) 1089; People v. Cole, 113 N. E. (N. Y.) 790; Commonwealth v. Zimmerman, 108 N. E. (Mass.) 893; Swarts v. Siveny, 85 Atl. (R. I.) 33; Ex Parte Greenall, 96 Pac. (Cal.) 804; Frazier v. State, 97 So. (Ala.) 251; Ex Parte Wideman, 104 So. (Ala.) 440; Williams v. Scudder, 131 N. E. (Ohio) 481; State v. Van Doran, 14 S. E. (N. C.) 32; State v. Smith, 135 S. W. (Mo.) 465; Smith v. People, 117 Pac. (Colo.) 612.

The record disclosed no occasion on which appellee actually administered or directly prescribed treatment to any patient, unless possibly those hereafter to be referred to. Proof of the actual treatment of patients is not, however, indispensable and other acts and things come within the prohibition of the statute. It is enough if it be shown that appellee prescribed the medicine or the treatment to be given the patients. It is contended by appellee, and the contention may be admitted, that he had a right to sell a proprietary medicine without a license to practice

medicine. This right does not, however, authorize him to either prescribe or administer such proprietary medicine to patients.

There is, it seems to us, an effort on the part of many of the employees of the Institute who were called as witnesses to maintain an attitude of secrecy as to the actual internal working of the Institute.

Dr. Bair, a licensed physician, testified that he entered the Institute on May 31, 1930, for the purpose of examining prospective patients to determine their ailments and that he remained at the Institute, performing such duties, until the thirtieth of June following. Many of the treatment cards attached to the original diagnosis charts offered in evidence show that the patient was, in fact, examined prior to Bair's employment at the Institute. Bair testified that he signed hundreds of blank treatment cards and that he never signed one on which the designation of the disease or treatment prescribed was written.

Dr. Statler, said to be a licensed physician, who was not called as a witness by either side, was employed at the Institute and diagnosed many of the cases designated on the original charts that are in evidence. The evidence shows without conflict that the memorandum on the treatment cards is not in the handwriting of either Dr. Statler or Dr. Bair. The practice of having Dr. Bair sign blank treatment cards for some one else to fill out with the name of the ailment and the prescription to be observed in the treatment was obviously a mere effort to evade the law. Bair testified that he signed the treatment cards at the request or direction of appellee. No argument is necessary to demonstrate that the foregoing method constituted a violation of the statute. Dr. Bair could not, by affixing his signature to a blank treatment card to be pasted upon a diagnosis chart, made up many days before the same was signed by him, give any validity to the treatment previously or thereafter prescribed by some one else wholly without his knowledge. No one called as a witness by either party was, apparently, able to explain the exact course of procedure by which the secret formula of either appellee or Hoxsey was procured and furnished to the treaters for their use. There was a medicine room in the Institute presided over by some one or more persons not distinctly designated in the evidence. No licensed physician employed at the Institute knew

the formula used in compounding either the Baker liquid or the Hoxsey powder.

The inference to be drawn from the established facts must be that appellee compounded the liquid and Hoxsey the powder. Neither was sold by the proprietor to the Institute. They were prepared and designed to be used by the treaters in the treatment of the various diseases to which we have already referred. We think it may be safely assumed as a necessary inference from the evidence that the drugs were furnished to the treaters by either the appellee or Hoxsey. Appellee received all of the compensation paid by patients at the Institute and we gather from the testimony that all contracts were made either with him or Hoxsey or by some one authorized by them to do so. Arrangement with each patient contemplated that either the Baker or Hoxsey treatments of the various diseases specified, and none other, would be used. The Institute was not and could not be licensed to practice medicine. State v. Bailey Dental Co., 211 Iowa 781; People v. Painless Parker Dentist, 275 Pac. (Colo.) 928; People v. California Protective Corp., 244 Pac. (Cal.) 1089.

Appellee is also the owner and publisher of a magazine known as "TNT". Numerous advertisements of the Baker Institute appear in this magazine in which the words "Our treatment for cancer" and similar expressions are employed. In the December 1929 issue of the magazine appears a page article under the caption "Chats with our Doctor" purporting to have been written by Charles Gearing "of the Baker Institute." Appellee must have known that Gearing was not a physician. In none of the advertisements does it appear that appellee, in terms, stated that he is a licensed physician or that he personally treats diseases. The purpose of the advertisements was obviously to inform the public concerning the Institute, its purpose and accomplishments. The inducement thus held out to the public was naturally designed to attract patients to the Institute for treatment. No instance is shown in the testimony in which appellee professes to diagnose or treat patients. The following particular occasions are emphasized by appellant as specific violations of the statute:

(1) Magnus Johnson, a patient at the Institute, was treated by Hoxsey who performed a surgical operation upon his head. The exact character of the operation is not shown but the wound

or incision was sprinkled with a powder. The witness testified that appellee, as a part of the treatment, directed Johnson to go bare-headed in the sun.

(2) Hoxsey, called as a witness by appellant, testified that a patient complained to him that he had been given the hypodermic treatment with the result that he was rendered numb. The witness testified that he.reported the incident to appellee who said ''Go down and get the bottles at the treating room and stop them from using it.'' ''More than likely the medicine was too strong.'' Appellee took the bottle, rubbed some of the liquid on his own hands and said ''Well, no doubt, it is too strong.'' He then sent into the little drug room, up stairs, his private place known as the medicine room, took three bottles from the shelf, weakened the medicine and said ''Take this back to them and tell them to give this to the patients this morning and you watch closely, Harry, and see if any of them are paralyzed.''

(3) That on another occasion, appellee took a bottle of liquid to a party by the name of Webb who had sought admission to the Institute for treatment but, on account of his boisterous conduct, had been denied entrance, and gave it to him with oral directions to take it three times a day.

(4) A patient whose disease was diagnosed as appendicitis testified that she was told by appellee that, in the event of pain, to rub her abdomen downward and was advised by letter to put a plaster on it.

Appellee not having taken the stand in his own behalf, none of the above incidents were denied in testimony by him. Other witnesses to the Webb and Magnus Johnson transactions gave different versions thereof. Mrs. Webb, for instance, testified that the directions for administering the medicine were written upon a slip of paper pasted on the bottle and that she, and not Baker, administered the liquid to her husband.

It is strongly urged in behalf of appellee that he had a right to own, operate and control the Institute which they contend is, in fact, a hospital, and to employ licensed physicians to diagnose and treat patients therein. It is strenuously denied that appellee at any time or under any circumstances held himself out as a physician or claimed to be able to treat diseases or that he assumed to do so.

Appellee relies in support of his contention upon the fol-

lowing authorities: Tarry v. Johnston, 208 N. W. (Neb.) 615; State Electro-Medical Institute v. Platner, 103 N. W. (Neb.) 1079; In re Carpenter's Estate, 162 N. W. (Mich.) 963; Messner v. Board Dental Examiners, 262 Pac. (Cal.) 58.

Except Messner v. Board Dental Examiners, none of the foregoing cases are closely in point. They are readily distinguishable upon their facts. Appellee, as owner and proprietor of the Institute, was not a registered physician authorized to practice medicine, nor did he attempt to employ licensed physicians to diagnose, prescribe and treat patients in the Institute in accordance with their skill and judgment. All that was required of the licensed physicians employed by appellee was the diagnosis of the disease.

It was said in the district court of appeals, in Messner v. Board Dental Examiners, supra:

''A reasonable construction of the quoted provisions of the statute appears to be that, to come within the terms thereof, one must in some manner, to some extent, directly or indirectly, control or direct some professional service of the kind that dentists are licensed to render.''

This language is pertinent to our discussion in this case. Dr. Bair testified that during the time he was at the Institute he observed appellee directing the treatment of patients; that he heard him say that he wanted the secret remedies used and none other. The veracity and good faith of Dr. Bair are challenged by appellee, but his testimony is, much of it, undisputed.

The right to lawfully practice medicine in this state is a personal one. To attain such right, certain statutory requirements must be complied with. The violation of the statutes quoted within the proper scope of the present inquiry to justify a decree herein as prayed must necessarily also be personal. In other words, to justify a permanent injunction, under the provisions of Section 2519 of the Code of 1927, against this appellee it must appear by a fair preponderance of the evidence that appellee has directly or indirectly done, or performed, such act or acts as fall within the definition of practicing medicine. Clearly, if the incident referred to in the testimony of Hoxsey concerning the effect of the Baker treatment upon certain patients is to be believed, then appellee prescribed the medicine and, in effect,

directed the treatment to be administered. The liquid used in the treatment was diluted by appellee and Hoxsey was directed to return it and to take other bottles of the liquid given him by appellee to the treater in charge. The particular instances referred to above seem at least to illustrate somewhat the methods pursued at the Institute and the part taken by appellee therein. They are circumstances to be considered with all the rest of the testimony in determining the ultimate facts of the case.

To recapitulate, every patient in the Institute was there for treatment under some form of contract or arrangement with appellee. All of the medicine used in the treatment of the numerous diseases scheduled in the advertisements of the Institute consisted of a secret preparation owned by and known only to appellee, or powder furnished by Hoxsey. None of the treaters were licensed physicians, and, except in a few possible instances, the treatments were administered by the treater in accordance with his or her own judgment and in obedience, at best, to general instructions previously issued to the employees of the Institute and were not performed under the direction or control of a licensed physician. So far as appears from the original diagnosis charts offered in evidence, neither treatment nor medicine was prescribed by the examining physician. The treatment charts on which the disease and treatment were specified were not written by a licensed physician, nor does the record disclose by whom this was done. The medicine room in the Institute is designated by at least one witness as the private room of appellee. . The secret of the formulas used at the Institute was carefully and scrupulously guarded by both Hoxsey and appellee. The compound used was not sold to physicians or to patients by appellee as the owner thereof, but was furnished by him, under his contract with the patients, directly to them without the aid of medical skill or advice.

The secret liquid preparation must have been furnished to treaters by appellee and this was without a prescription or by direction of a licensed physician. The preparations thus supplied were administered by treaters to hundreds of patients of the Institute. The trial court rightly held that, under the evidence, the co-defendants who were treaters in Baker's Institute were all practicing medicine within the purview of the statute. As already stated in this opinion, all of the defendants admitted

that they did not have a license from the department of health of this state. The right of one neither a pharmacist nor licensed physician to manufacture and sell a proprietary medicine neither permits nor authorizes such proprietor to prescribe or administer the same to patients. State v. Cornelius, 200 Iowa 309; Gouy Shong v. Chew Shee, 150 N. E. (Mass.) 225. Medical practice acts are enacted for the protection of the public against the unskilled treatment of the sick or diseased by persons having neither the preparation nor the skill to diagnose diseases or to administer powerful and poisonous drugs. The welfare of the public is of the utmost concern in the enforcement of laws designed to guard and protect the public health. The merits of the secret formulas used in the treatment of cancer and other diseases is not of controlling importance in the decision of this case. Our concern is with the statute, which should be strictly observed. The legislature has seen fit to provide that any person engaging in the practice of medicine, without having first procured a license, may be permanently enjoined. The duty, upon a proper showing to grant such relief, is imposed upon the court by act of the legislature. It seems to us that the only conclusion to be drawn from the evidence shown in the record is that appellee was continuously engaged in the violation of certain definite provisions of the statutes of this state. Both the letter and the spirit thereof are being violated.

II. Appellee pleaded a misjoinder of causes of action and of parties. While to justify an injunction against any one or more of the defendants, it was incumbent upon appellant to prove that such defendant personally performed some act or acts in contravention of the statute, it is nevertheless true that all of the defendants were engaged jointly and in co-operation in the furnishing or administering of the liquid and powder used in the treatment of patients in the Institute. The court did not, therefore, err in refusing to dismiss the petition upon the ground of a misjoinder either of parties or causes of action.

III. A motion filed by appellee to dismiss the appeal was submitted with the case. The ground of the motion is that not all of the evidence taken upon the trial is contained in the abstract and, therefore, the cause may not be tried *de novo*. Appellee filed an amendment to the abstract. The transcript of the evidence is also before us. No doubt, much testimony deemed

582

immaterial as against the appellee Baker is omitted from the abstract. The motion upon the showing made should be and it is overruled.

We feel that further discussion of any of the propositions urged and discussed by the respective parties is unnecessary and that the judgment of the court dismissing the petition .as to appellee Baker cannot be sustained. The judgment and decree is, therefore, reversed and the cause remanded to the district court for decree in harmony with this opinion, or, if counsel prefer, a decree may be entered in this court permanently enjoining appellee from practicing medicine in this state without a license.— Reversed and Remanded.

All Justices concur.